UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

****************************

MICHELE FECHO et al,
          Plaintiffs

vs.                               Case No. 1:11-cv-10152-MBB

ELI LILLY & COMPANY et al,
          Defendants

****************************

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE MARIANNE B. BOWLER
AT BOSTON, MASSACHUSETTS
ON MAY 16, 2011

APPEARANCES:

For the Plaintiffs:
Davison Law, LLC
280 Summer Street, 5th Floor
Boston, Massachusetts 02210
617-345-9990
By Juliet A. Davison, Esquire

Aaron M. Levine & Associates
1320 19th Street N.W., 5th Floor
Washington, DC 20036
202-833-8046
By Aaron M. Levine, Esquire

Transcriber:  Karen M. Aveyard,
              Approved Federal Court Transcriber

-------------------------------------------------------

**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**

APPEARANCES (continued):

For Defendant Eli Lilly & Company:

Pepper Hamilton, LLP
620 Eighth Avenue, 37th Floor
New York, New York 10018
212-808-2700
By Samuel J. Abate, Jr., Esquire

Shook, Hardy & Bacon, LLP
5 Park Plaza, Suite 1600
Irvine, California 92614
949-475-1500
By Michelle M. Fujimoto, Esquire

Ice Miller, LLP
One American Square, Suite 2900
Indianapolis, Indiana 46282
317-236-2332
By James Burns, Esquire

For Defendant Bristol-Myers Squibb Company:
Sedgwick, Detert, Moran & Arnold, LLP
125 Broad Street
New York, New York 10004
212-422-0925
By David M. Covey, Esquire

For Defendant Elan Pharmaceuticals, Inc.:
Harris Beach, PLLC
100 Wall Street, 23rd Floor
New York, New York 10005
212-313-5458
By Rosevelie Marquez Morales, Esquire *(Telephonically)*

For Defendant Ortho-McNeil Pharmaceuticals:
Drinker Biddle & Reath, LLP
1500 K Street N.W., Suite 1100
Washington, DC 20005
202-230-5136
By Brianna L. Silverstein, Esquire *(Telephonically)*

For Defendant Person & Covey, Inc.:
Hudgins Law Firm, PC
515 King Street, Suite 400
Alexandria, Virginia 22314
703-739-3300
By Sean C.E. McDonough, Esquire *(Telephonically)*

APPEARANCES (continued):

For the Defendant Merck & Company, Inc.:
Drinker Biddle & Reath, LLP
500 Campus Drive
Florham Park, New Jersey 07932
973-549-7363
By Heidi E. Hilgendorff, Esquire *(Telephonically)*

For the Defendant, Premo Pharmaceutical Laboratories, Inc.:
Goodwin Procter, LLP
901 New York Avenue N.W.
Washington, DC 20001
202-346-4135
By Eric I. Goldberg, Esquire *(Telephonically)*

For the Defendants, Glaxosmithkline and Mallinkrodt, Inc.:
Whitney & Bogris
401 Washington Avenue, 12th Floor
Towson, Maryland 21204
410-583-8000
By Daniel W. Whitney, Esquire *(Telephonically)*

For the Defendant, Abbott Laboratories, Inc.:
Goulston & Storrs
400 Atlantic Avenue
Boston, Massachusetts 02110
617-574-4029
By Jonathan E. Small, Esquire *(Telephonically)*

For Aventis Pharmaceuticals, Inc.:
McGivney & Kluger, PC
23 Vreeland Road, Suite 220
Florham Park, New Jersey 07932
973-822-1110
By William D. Sanders *(Telephonically)*

1                      P R O C E E D I N G S

2

3             THE CLERK:  We're on the record in the matter of Fecho

4    et al versus Eli Lilly & Company et al, Civil Action

5    No. 11-10152.

6             Counsel, please identify themselves for the record.

7             (Announcement for counsel present telephonically.)

8             THE COURT:  We'll have to wait and do it again.

9             (Announcement for counsel present telephonically.)

10            THE COURT:  All right.

11            THE CLERK:  We're on the record in the matter of Fecho

12   et al versus Eli Lilly & Company et al, Civil Action

13   No. 11-10152.

14            Counsel, please identify themselves for the record.

15            MS. DAVISON:  Good afternoon, your Honor.  Juliet

16   Davison for the plaintiff, and with me is lead counsel, Aaron

17   Levine.

18            THE COURT:  Thank you.

19            MR. LEVINE:  Good afternoon.

20            MR. ABATE:  Good afternoon, your Honor.  Sam Abate

21   from Pepper Hamilton for Eli Lilly & Company.  Also with me

22   today is Michelle Fujimoto from the Shook, Hardy & Bacon law

23   firm for Eli Lilly; and Mr. Jim Burns from the Ice Miller firm,

24   also on behalf of Lilly.

25            MR. COVEY:  Good afternoon, Judge.  I'm David Covey

1    from Sedgwick.  I represent Bristol-Myers Squibb.

2         THE COURT:  Well, glad to see you, as well as those on

3    the record by telephone.

4         Do we have everyone?

5         I think so.

6         Well, I take it there are some issues, so where shall

7    we start?

8         Mr. Levine, you're usually a good point.

9         MR. LEVINE:  We have been working out in the hallway

10   where most justice is done, and I think we --

11        THE COURT:  This is true, and on the front step.

12        MR. LEVINE:  Well, Mr. Burns and I agree that we are

13   going forward with the seven days of hearings in September

14   without any delay of that.

15        Am I correct?

16        MR. BURNS:  I suspect the Court will have something to

17   say about that, but I believe that's up to the Court.

18        THE COURT:  The date you wish to commence?

19        MR. BURNS:  It's certainly fine with me, but I think

20   it's up to the Court.

21        MR. LEVINE:  You set aside September 12, 13, 14, 15,

22   16, 19, 20 and 21, I believe.

23        THE COURT:  That's fine.

24        MR. LEVINE:  Eight days.

25        While we're here, this would not be a bad time to

1    discuss some sort of an arrangement of those days.  For

2    example, perhaps you had three defendants on the first three

3    days -- this is their motion.  They're going to file the

4    Daubert motion.  So on the 12th, 13th and 14th, they could

5    bring in their three experts, who are going to say that my

6    experts are -- their methodology is flawed, and then on the

7    15th, 16th and 19th, I would bring my experts back to reclaim

8    themselves, and then we could argue on the 20th and 21st.

9         I'm just throwing it out as some sort of a program.

10         MR. COVEY:  Sure.

11         Your Honor, the burden of proof under Daubert is

12    plaintiffs'.  Plaintiffs' experts have gone first in every

13    Daubert hearing I've done.  It's probably about 15 of them over

14    the years.  So I think we should set a schedule each and every

15    plaintiffs' expert that counsel has.  When we finish with them,

16    we'll bring in whatever defense experts we want, if any.

17         THE COURT:  That's usually the way it's done.

18         MR. LEVINE:  Okay.  I thought because of the seven

19    experts they have and the war that's going to start, that it

20    might be the other way.  But I'll be happy to start on the

21    12th, 13th and 14th with my experts, and then the 15th, 16th

22    and 19th could be their experts, and the 20th and 21st could be

23    arguments.  I just throw it out as some sort of --

24         THE COURT:  What's your preference for -- you know, we

25    have two ways of doing things in this court.  We sit a lot from

1    9:00 to 1:00 and that's it, or we can sit from 10:00 to 4:00

2    with a break, a one-hour break.

3              MR. LEVINE:  Can I ask --

4              THE COURT:  We want to get it all done, so...

5              MR. COVEY:  I don't want to interrupt Mr. Levine.

6              Were you saying something?

7              MR. LEVINE:  I think you are going to be working very

8    hard.

9              THE COURT:  It won't be the first time, Mr. Levine.

10             MR. LEVINE:  You've got at least a thousand studies

11   out there and at least a hundred that you're going to have to

12   be dealing with.  You're the one who is going to carry the

13   burden --

14             (There was a break in the audio.)

15             MR. LEVINE:  -- so you tell us what you think.

16             THE COURT:  Well, I mean, I'm thinking about getting

17   it all in in that time period.

18             MR. LEVINE:  Right.

19             MR. COVEY:  If I may, your Honor, Dauberts can do a

20   trial, although we're only talking about admissibility, and I

21   think having the ability to work 10:00 to 4:00 where we have

22   lunch gives us the ability, and Mr. Levine also, to do some

23   work over lunch so that things can go in quicker, hopefully,

24   and certainly in a clearer way.  Without that lunch break --

25             THE COURT:  I think I'm inclined to agree with you,

1    with the caveat that there will be criminal business.  I mean,

2    this arrest that you just saw just happened yesterday and I

3    have to be able to accommodate those things.

4         MR. COVEY:  As an ex way, way back prosecutor, I'm

5    well aware of that, and we just go sit in the back while you

6    take care of it?

7         THE COURT:  Yeah.  I'm not the emergency judge, so it

8    shouldn't be too busy.  But there are things that I sometimes

9    have to deal with and I can set them for -- I can't set them

10   after 4:00 if I have people in custody, but I can set them at

11   9:30 or quarter of 10.

12        MR. COVEY:  Sure.

13        THE COURT:  We work around that, yeah.

14        MR. LEVINE:  I have to bring people in from around the

15   world, around the country.

16        So do you think I can count on 12th, 13th and 14th for

17   my --

18        MR. COVEY:  Yeah, I think you can.  I think what makes

19   a lot of sense is that we get together in the next month or so

20   and figure out who is coming in when, so that we can give you

21   our best estimate as to how long we will take in cross so that

22   your people can come in and go out.  We have no interest in

23   having them spend extra time here.  And the same --

24        THE COURT:  Yeah, work together on this, I mean, and

25   you've worked together long enough that you should be able to

1   agree on timing.

2          MR. LEVINE:  That brings us to Dr. Clarke, who I don't

3   think we have a problem.  The problem arose because the

4   materials owned by Georgetown, pursuant to an FDA $3 million

5   contract, it's not ours.  We have no objection.  We've been

6   working with the government counsel and Georgetown counsel, and

7   I think everything is going to be in our office on Friday, and

8   the question is --

9          (Announcement for counsel present telephonically.)

10          THE COURT:  Better late than never.

11          MR. SANDERS:  I apologize for running late.  I was

12   having difficulty communicating.

13          THE COURT:  And will you identify yourself for the

14   record.

15          MR. SANDERS:  Yes.  William Sanders for Aventis

16   Pharmaceuticals.

17          THE COURT:  Okay.  Thank you.

18          Mr. Levine is discussing scheduling.

19          MR. SANDERS:  Thank you.  I'm sorry to interrupt.

20          THE COURT:  No problem.

21          MR. LEVINE:  I've moved on to Dr. Clarke.

22          If Georgetown has glass slides and won't release them,

23   then we'll be happy to arrange for final photo microphotography

24   and send them to other counsel.  That's the best I can do.  But

25   I need, and Georgetown needs, a protective order.  They sent

1    one that's going back and forth.  You tell me if we're close.

2          MS. FUJIMOTO:  Your Honor, may I address that?

3          THE COURT:  Certainly.

4          MS. FUJIMOTO:  We are close, and there's never been an

5    issue about affording confidentiality.  In fact, we offered a

6    blanket confidentiality order consistent with what she used in

7    the research community.  The challenge has been, and one of the

8    many issues we need to address with you, is the delay that has

9    occurred for a number of reasons in understanding what type of

10   data, what format and when it could be produced.

11          We had expected, under the Court's last ruling, that

12   we would have gotten what we requested by May 10th.  The

13   morning after the hearing when your Honor said we were entitled

14   to the data, we conferred with our experts so that we had a

15   clear understanding of what we should request and expect, and

16   we sent that to Mr. Levine.  Three meet-and-confer discussions

17   over the last two weeks.  Still don't have a clear

18   representation of what will be produced on Friday.

19          Assuming it's what we would expect, most of it should

20   be electronic.  We've said that from the beginning, based on

21   our information.  Any hard copy, we would be more than happy to

22   copy.  They should be photomicrographed, the slides, under

23   current research standards.  If not, then, you know, pathology

24   slides are produced, you know, with adequate chain of custody

25   protection in litigation all the time and we would work with

1    that.

2           So we just found out in the hallway this morning, and

3    by his letter, that he should --

4           (There was a break in the audio.)

5           MS. FUJIMOTO:  -- have most everything, although he's

6    not sure what it will be, on Friday.  We then will need to --

7    we don't know yet what the volume is, and until we see

8    everything on Friday and know what's there, we won't know how

9    long it will take to review via our experts to get us ready to

10   depose Dr. Hilakivi-Clarke.

11          The challenge we face now is how do we get the data,

12   when, how much is it, and then after that we can depose

13   Dr. Hilakivi-Clarke, and we can determine to what extent our

14   experts need to supplement.  And I know that they will.  They

15   will need to supplement because her opinions were based on this

16   unpublished data.

17          So what has become a challenge to us, and we have a

18   great interest in keeping the schedule as it was agreed upon,

19   the problem is that the circumstances have changed dramatically

20   since it was negotiated, and right now our Daubert brief will

21   be due well before we are able to finish with Hilakivi-Clarke,

22   complete the Fischer deposition and do supplements as we

23   briefed.

24          THE COURT:  Well, let's see what you see on Friday and

25   then you'll go from there.

1           MS. FUJIMOTO:  All right.  And we will work with

2      Mr. Levine on figuring out how that works and when.

3           MR. LEVINE:  We could have a whole day's conference on

4      who's delaying who here.

5           THE COURT:  I don't want to hear about it.

6           MR. LEVINE:  I don't want to drag you into it.

7           THE COURT:  We're all grownups here.

8           MR. LEVINE:  Just we'll say they asked for 14

9      depositions of doctors.  We have the right to cajole the

10     doctor, pay the doctor.  All of a sudden they don't want any of

11     them.  But we're not going down that road today.

12          THE COURT:  Just a little bit.

13          MR. LEVINE:  That brings us down to the Chinese

14     translation, which they have.  We've given it to them.  And

15     that, I believe, brings it down to the financial (inaudible),

16     and very frankly, it's impossible for me to cross-examine or

17     get anything of value from their specialist because they're too

18     specialized, they're too evident and they're too knowledgeable,

19     and it's impossible to get somebody to say, well, okay, your

20     expert's methodology is good.  I've changed my mind.  It's

21     impossible.

22          The only thing I can get is bias and money, and the

23     last two and then the next upcoming are people who are in bed

24     with the drug companies, we feel.  (Inaudible) testified and

25     Prempro has testified on hormone replacement.

1          Now, I can only ask for, according to counsel, four

2     years.  We think that the rules allow us to go 10 years.  We

3     think the rules allow us to ask how much money are you making

4     from drug companies versus your real job.  We think we're

5     entitled to know how much payment they've gotten of a

6     significant amount which we could use to show bias at the

7     hearing.

8          Now, if Ms. Fujimoto will just back off on some of her

9     incessant objections and just agree to give us somewhat loose

10    reign, we can take this matter out of your hair.  I don't think

11    you ought to go through page by page of the depositions.

12          THE COURT:  No, I don't.

13          MR. LEVINE:  But the objections were excessive and

14    they just threw us off.

15          We had, last Friday, a physician who happened to be

16    the oncologist of one of my plaintiffs.  So I got his record.

17    He states in his report he never asks about DES because it's

18    not important, nobody cares about it.  It has nothing to do

19    with breast cancer patients.  His report, his name on it, his

20    signature on it.  He said it looks like mine, it sounds like

21    mine, but I'm not going to admit that it's mine, and she

22    objected no less than five times, running interference for him,

23    and I could never get an answer, and that's very frustrating.

24          THE COURT:  An answer to what question?

25          What was the specific question you didn't get the

1   answer to?

2          MR. LEVINE:  Did you say that -- in the chart, it

3   says -- oh no, she is a DES daughter.  Previously he said:  I

4   never asked.  It's of no importance.

5          (There was a break in the audio.)

6          MR. LEVINE:  He said:  I can't give you an answer

7   because I've whited out the patient's name.  I had to.  She

8   asked me to, because she's still going to this man.

9          The art of the litigator, I can't ask you to sit there

10  during the deposition, but I can tell you that it was very

11  frustrating and not within the spirit of, okay, let's see what

12  you've got and let's see what I've got, and that's my

13  complaint, your Honor.

14          MS. FUJIMOTO:  Your Honor, I know that the Court has

15  no interest in reading transcripts and you shouldn't have to,

16  but boy, I would invite it if you have at all any doubts as to

17  the propriety of the objections, because I think the record

18  would be very clear that the form and format of the questions

19  was something I've never encountered professionally.  We do

20  have the right to preserve our objections and preserve the

21  record, and I believe that my objections were all well-founded.

22  I wouldn't have expressed them otherwise.

23          Were there frequent objections, relatively normal

24  perhaps, but it was --

25          THE COURT:  No, I perused it, so I know how frequent.

1        MS. FUJIMOTO:  And they were due to the form of the

2    question where there were five or six questions in any given

3    question.

4        The depositions did not go any longer than normal; and

5    as to Dr. Bluming, your Honor, we did get the rough and I'd be

6    more than happy to submit that.  There were not objections to

7    the questions about the authenticity of Dr. Bluming's report.

8    What had happened is they produced a document that had a lot of

9    information redacted, and things were circled and written on

10   it.  So it clearly wasn't an accurate or an exact copy.

11       All Dr. Bluming said was, yes, this is my letterhead

12   and it reads as if it's mine.  I don't know the patient name, I

13   can't confirm it, but sure, I believe that is, and he testified

14   fully to it.

15       THE COURT:  And the terms of the deposition were that

16   all objections, except as to form, were waived until --

17       MR. LEVINE:  Everything is waived.  Everything.

18       MS. FUJIMOTO:  No, your Honor, nothing was waived, and

19   I have been in litigations where we do pre-agree to object only

20   to form.  I would have been more than happy to do that.  That's

21   never been the agreement.

22       THE COURT:  Well, you should do that at the beginning

23   of every deposition.  It should be on the record.

24       MR. LEVINE:  Well, I made the statement, your Honor,

25   that we waive everything.

1          MS. FUJIMOTO:  Well, your Honor, I think we're talking

2    about two different things.  The ability to say "object to

3    form" and that's it would be fine.  We've never had that

4    agreement.  And with this experts, the amount of discussion,

5    coaching and objecting was far beyond anything I've ever dealt

6    with.

7          But what Mr. Levine proposed was for us to waive our

8    ability to object at all, and then after the fact, if he

9    were --

10          THE COURT:  Waive or reserve?

11          MS. FUJIMOTO:  Reserve all objections; and then what

12   that would do is essentially put the burden on us at the end of

13   the day if he were to attach transcripts of the deposition

14   testimony to the record.  Then we would have to go back and

15   figure out which questions were objectionable and on what basis

16   so that you could rule on them.

17          That is not something we believe is required or really

18   feasible in the context of this hearing.

19          THE COURT:  Well, I just urge you to make the process

20   as efficient as possible.

21          MS. FUJIMOTO:  We have tried very hard, and

22   Dr. Bluming's deposition lasted two and a half hours.

23   Dr. Geradts' was three.  We have not extended these depositions

24   unnecessarily and all objections were made in good faith, your

25   Honor.

1          MR. LEVINE:  I'd ask the Court to rule preliminarily

2     that if I, on the record, waive all objections, all of them,

3     over the question, anything, then the only objections they

4     should make is if the question is really incomprehensible and

5     they ask me to clean it up, and I will.

6          But these are not (inaudible) depositions.  These are

7     not trial depositions.  These are only kind of very discovery

8     exploration:  What's your methodology, what don't you like

9     about my expert's methodology; and where I reserve everything,

10    I really don't think they ought to object at all, unless some

11    of my questions are cumbersome and awkward and they say clean

12    it up, and I have an obligation to clean it up.

13         I would ask the Court's informal guidance on that

14    point.

15         THE COURT:  Well, I think the traditional way it's

16    usually done is reserve all objections, except as to form.  I

17    think that's the easiest way.

18         MR. LEVINE:  I'm willing to go further, waiving the

19    form.

20         MS. FUJIMOTO:  And, your Honor, we don't mind saying

21    "object to form."  I will state only that that was not the

22    rules that were applied to his expert.

23         (There was a break in the audio.)

24         MS. FUJIMOTO:  So it would be a late-in-the-game

25    difference, but --

1          THE COURT:  No, they should be the same.

2          MS. FUJIMOTO:  Well, there was no -- trust me, all of

3     his objections were long-speaking and arguably, I think if you

4     look at the record, there was a lot of problems with

5     highlighting and note writing to the expert.

6          THE COURT:  Okay.  I'm going to leave you to the

7     depositions yourselves.

8          MS. FUJIMOTO:  That would be fine.  That would be

9     fine, your Honor.

10         May I speak only to the Chinese article, just so that

11    the record is clear and there's no misunderstanding?

12         We received an e-mail about a Chinese article on April

13    28th that he said all of my experts will now rely upon this.

14    We immediately replied back and said, fine, would you please

15    provide us with the English translation, if, in fact -- or

16    whatever it is that your experts relied upon.

17         THE COURT:  This is the Yao article?

18         MS. FUJIMOTO:  Yes.

19         They refused to do that.  This morning in the hallway,

20    we did get a translation of the article that was done on May

21    10th, so we do have it now.  But I just wanted to clarify for

22    the record again, we're having challenges with delay.

23         THE COURT:  Translation by whom?

24         MR. LEVINE:  Translated by a professional translator.

25    We didn't want to give them Julie, my associate's translation,

1    because for sure they're going to fight it.

2         They're going to fight this one.  They're going to

3    have their own translator.  I assure you, we gave them the

4    abstract.  They don't need any more time.  If these 14

5    companies don't know how to translate attorney's documents --

6    well, maybe they don't, but they're all over the world.

7         Anyway, we've given it to them and that's it.

8         MS. FUJIMOTO:  Your Honor, there won't be a fight.

9    The question was we're entitled to see what your expert relied

10   upon and when they had it, and now we have it.

11        THE COURT:  All right.  What else?

12        MR. LEVINE:  The finances.

13        Are we entitled to ask questions over 10 years?  Are

14   we entitled to ask questions as to any defendant?  Their

15   position is the defendants only have to give us their finances

16   from Lilly and Squibb, where we claim all of the defendants.

17   That's about it.

18        MS. FUJIMOTO:  On Dr. Shulman, your Honor, his

19   recitation of the meet-and-confer discussions is not accurate.

20   What we told him we would allow Dr. Shulman to testify to, and

21   we did as to Drs. Geradts and Bluming, was not just four years.

22   That had to do with Rule 26 and the litigation deposition

23   testimony and we allowed that.  We invited him, and we believe

24   the proper method is to come to the deposition and ask all of

25   your questions.

1        We told him ahead of time that Dr. Shulman had not

2    done any work for Lilly or Bristol-Myers other than this DES

3    litigation, hadn't been paid outside of that, but he would be

4    more than welcome to ask Dr. Shulman that.  We invited him to

5    ask Dr. Shulman any and all questions about his ties or money

6    received for medical consulting or litigation with the other

7    defendants.  And then if, in fact, there is some foundation

8    laid for some unsavory or more extensive relationship than

9    would, you know, be expected to where he would establish bias,

10   then we would cross the bridge of what information we would

11   provide.

12        The reality is that none of our experts has worked for

13   Lilly beyond this litigation.  To the extent Dr. Shulman has

14   done nonrestricted educational grants for other defendants, he

15   got the information on the website and we're more than happy to

16   have him ask as many deposition questions on that.

17        The question was whether we had to undertake the

18   burden of providing a listing and going to all the defendants

19   and Dr. Shulman about all the relationships ahead of time, and

20   then --

21        THE COURT:  Well, I would think most of these

22   defendants, if they have academic appointments, have to file

23   this.

24        MS. FUJIMOTO:  And it's available on the website, your

25   Honor, and he got that information, and we welcomed him to ask

1   Dr. Shulman any and all questions about that work.

2          MR. LEVINE:  The question is:  How much are you

3   compensated hourly at your position as a pathologist, because

4   I'm trying to show how much money he's making from the drug

5   companies and how much he's making as a pathologist.

6          "Objection.  Irrelevant."

7          "I'm sorry."

8          "I'm going instruct him not to answer."

9          Do you remember that?

10         MS. FUJIMOTO:  Yes, your Honor.  There was one

11  instance --

12         THE COURT:  Well, why isn't that a fair question?

13         MS. FUJIMOTO:  Because, your Honor, the case law, and

14  I believe we briefed it, is that they are not entitled to seek

15  Dr. Geradts' personal income, including whether it's an hourly

16  rate.  He's not compensated by the hour --

17         (There was a break in the audio.)

18         MS. FUJIMOTO:  -- or salary.  What they are entitled

19  to under the law is the percentage of income he -- what

20  percentage of income is related to litigation consulting.  We

21  actually told him:  You can ask about what percentage is

22  related to pharmaceutical consulting, if you wanted to expand

23  it beyond that.  That --

24         THE COURT:  Did you ask that question, Mr. Levine?

25         MR. LEVINE:  I did.  I only get it back from Lilly and

1    Squibb as if the other 12 defendants don't exist.  I'm entitled

2    to it from all defendants.

3            THE COURT:  I believe you are entitled to it from all

4    defendants.

5            MS. FUJIMOTO:  He was entitled to ask Dr. Geradts

6    about that.  He didn't.

7            MR. LEVINE:  Well, I'm entitled to those.

8            MS. FUJIMOTO:  He was entitled to ask Dr. Bluming

9    about it, he didn't.  We never said he couldn't.  This issue

10   about all the other defendants came up the day before

11   Dr. Shulman's deposition and I invited him.  No question he can

12   do biased discovery, your Honor.  It was the method and the

13   scope of it.  I said ask him those questions as to those

14   defendants.

15           He already has website information as to most of them,

16   but he cancelled the deposition, so we haven't gotten there

17   yet.

18           MR. LEVINE:  Rather than tear you back and forth, if

19   you'll agree to relax your stringent -- what I call

20   stringent -- orders on these people and let me get into their

21   finances, key to show whether they're really doctors or whether

22   they're really drug people.  If you'll give me that

23   representation, we can go home.

24           MS. FUJIMOTO:  Your Honor, I will represent to the

25   Court that I have always, and will continue, to follow the laws

1    to what he's entitled to, and he can ask our doctors any

2    questions about any relationships, consulting or otherwise,

3    with these defendants.  I've never suggested that he couldn't.

4         MR. LEVINE:  All of them.

5         MS. FUJIMOTO:  The fight came as to a predeposition

6    production for us to make a list and prepare documents

7    regarding all of those relationships.  We told him from the

8    beginning he could ask about that.  That's not an issue.  And

9    my representation, your Honor, has always been ethical and

10   consistent with the law.

11        THE COURT:  All right.  Well, you can ask.

12        MR. LEVINE:  On the subject of documents, Dr. Shulman,

13   who has given a number of depositions in other cases, seems to

14   leave everything at home.  I can show you depositions where

15   there were 20 questions, "Oh, I left that at home.  I left that

16   at home."  That's why I asked on my notice to produce a list,

17   but evidently I'm not going to get a list.

18        THE COURT:  Well, if it's a subpoena duces tecum for

19   the deposition, he's supposed to bring what's on the list, or

20   objections should be raised prior to the deposition.

21        MS. FUJIMOTO:  And that's exactly what was done, your

22   Honor.  We provided information documents and/or objections to

23   the extent they exceeded what we've talked about.  We invited

24   him to ask the questions.

25        At every deposition thus far, Drs. Geradts and

1    Bluming, they have brought their entire file.  They have not

2    left anything at home.  I believe you said Shulman or his

3    comment relates to a deposition he faxed to me before

4    Dr. Bluming's where it was in 1987, and they ask him if he had

5    invoices from a prior case five years before and he said no, it

6    had never been asked for.

7            So that is not accurate as to Drs. Bluming or Shulman.

8    We've always brought everything and we'll continue to bring

9    their entire file.

10           THE COURT:  All right.  If he asks for it, either

11   bring it or file your objection in a timely fashion.

12           MS. FUJIMOTO:  Which we have done, your Honor, and

13   will continue to do.

14           THE COURT:  And these kinds of -- if you have issues

15   like that, you know, I can deal with that in a telephone

16   conference rather than bringing you here.

17           MS. FUJIMOTO:  Absolutely, your Honor.

18           MR. LEVINE:  Thank you, your Honor.  That's all we

19   have.

20           MR. COVEY:  There are two more issues of mine, it's

21   brief, the fact that Mr. Levine didn't mention this does the

22   Daubert inquiry include just methodology or is general

23   acceptance of, quote, the ultimate opinion part of it.

24           Those are in the letters to you.  My suggestion to the

25   Court after citing a few cases that I cited, and he cited his,

1    was absent direction to the contrary from you, this is an issue

2    for the Daubert briefing and when we have a full factual

3    record.  I didn't want to let it slide and not address it today

4    if the Court wanted to hear anything about it.

5          THE COURT:  No.  No, I don't want to hear anything

6    about it.

7          MR. COVEY:  And that defense suggestion is okay with

8    the Court, we'll just -- thank you.

9          MR. ABATE:  One other item, your Honor, I think, and

10    that is in view of the fact that on Friday, we'll start

11    receiving information from Dr. Hilakivi-Clarke, and we'll

12    obviously have to take the appropriate steps to review the

13    materials, and then at some point take her deposition, we still

14    have several of our experts that are being deposed between now

15    and -- our last expert --

16          (There was a break in the audio.)

17          MR. ABATE:  -- currently scheduled is next Tuesday.

18    Dr. Fischer, who gave us the significantly amended report, her

19    deposition is next Wednesday.  So after next Wednesday, we will

20    still have to take Dr. Shulman, and we've actually offered

21    Mr. Levine --

22          MR. LEVINE:  June 2nd.

23          MR. ABATE:  -- June 2nd as a date when Dr. Shulman is

24    available for deposition.  We have not heard back from him on

25    that.

1          And then, of course, we have to schedule

2     Dr. Hilakivi-Clarke's deposition, which I'm fairly certain will

3     not take place during the month of May, given the fact that we

4     don't have data at this point.

5          Daubert briefing, we've already talked earlier about

6     the CMO and in terms of the September dates, but under the

7     current CMO schedule, our Daubert brief is due June 15.  I'm

8     not sure when between next week and June 15 we'll take

9     Dr. Hilakivi-Clarke's deposition, so it's something that --

10          MR. LEVINE:  I agreed to push everything back.

11          MR. ABATE:  You agreed to two weeks and I understand

12     that, but the issue for two weeks is that we can't agree to any

13     time yet --

14          THE COURT:  Well, how do you want to modify the

15     briefing schedule?

16          MR. ABATE:  I think we need to know -- I think once we

17     have a sense of when we're going to depose

18     Dr. Hilakivi-Clarke --

19          MR. LEVINE:  Whenever you want.

20          MR. ABATE:  Yes, I understand that.  But until we've

21     looked at the data and have some sense about it, and can

22     supplement our reports and be prepared to take her deposition,

23     we can't come to you and say, okay, May 30, June 15.  Whatever

24     the magic date is, your Honor, we're just not there yet.  Once

25     we know that date, we can do two to two and a half, three weeks

1    after that for our briefing, but I think it's a little

2    premature to set the briefing schedule right now.

3              And I'm mindful of the fact, your Honor, that you will

4    want time to review these papers prior to the September

5    hearing, so --

6              THE COURT:  I don't want to spend my whole vacation

7    reading them.  Half, maybe.

8              MR. ABATE:  Right now, your Honor --

9              THE COURT:  Airplane time, yes, but --

10             MR. ABATE:  Sure.  And right now the schedule is blank

11   in August because all the briefing under the current schedule

12   ends sometime in a reasonable time in July.

13             THE COURT:  Well, so you know you have a little bit of

14   leeway.

15             MR. ABATE:  Right.

16             THE COURT:  So you'll come back to me in a few weeks

17   with a joint proposed modification of the briefing schedule.

18             MR. ABATE:  Yes.

19             MR. COVEY:  And I think we're done with that, unless

20   there's a late surprise.

21             MR. ABATE:  Okay.

22             MS. FUJIMOTO:  Right.

23             MR. LEVINE:  That's all we have, your Honor.

24             THE COURT:  All right.

25             MR. COVEY:  Thank you, Judge.

1          THE COURT:  All right.

2          MR. COVEY:  Thank you.

3          THE COURT:  You're welcome.

4          MR. LEVINE:  I know you wanted us to get into more

5     quibbling.

6          MS. FUJIMOTO:  Thank you, your Honor.

7          MR. ABATE:  Your Honor, should we schedule any type of

8     next conference?

9          In one way or the other -- I mean, we can certainly

10    agree on a schedule for --

11         THE COURT:  Why don't you agree on that.  If you think

12    you need it, agree.

13         MR. ABATE:  Well, I think what we'll probably want at

14    that point, your Honor, is to talk to you about actually what

15    you would be looking for.

16         THE COURT:  I can tell you a little bit of -- the week

17    of July 11th, I'll be hosting a group of Ukrainian judges here

18    and it will be tough to squeeze in the court time.

19         MS. FUJIMOTO:  (Inaudible.)

20         MR. COVEY:  I bet the translation issues, dealing with

21    DES and breast cancer, would really be fun with them.

22         THE COURT:  We'll have two.  We have two from the

23    State Department with them at all times so that --

24         MR. ABATE:  But once we agree on a date and come to

25    you with that for that --

1          THE COURT:  We're flexible.  We're here and we can fit

2     you in.

3          MR. ABATE:  And then we can talk about actually how

4     you would like the briefing to occur.

5          THE COURT:  Uh-huh.

6          MR. ABATE:  There might be a certain method that you

7     want, in terms of what you want to see in the briefs, the

8     manner that you want us to prepare them.

9          THE COURT:  Exactly.  Exactly.

10          MR. ABATE:  Okay.  Thank you, your Honor.

11          MR. COVEY:  Thank you, your Honor.

12          MS. FUJIMOTO:  Thank you.

13          THE COURT:  All right.  And for all those who are with

14     us by phone, we stand in recess.

15

16          (The hearing was concluded.)

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

       I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 29 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.

/s/ Karen M. Aveyard

Karen M. Aveyard

May 26, 2011

Date